**Louis MICKENS–THOMAS, Plaintiff,**

v.

**Donald VAUGHN, et al., Defendants.**

**No. CIV.A. 99–6161.**

United States District Court,
E.D. Pennsylvania.

March 15, 2002.

David Rudovsky, Kairys & Rudovsky, Leonard N. Sosnov, Philadelphia, PA, for Plaintiff.

Francis R. Filipi, Office of Attorney General Bureau of Consumer Protection, Harrisburg, PA, Randall J. Henzes, Office of Attorney General, Philadelphia, PA, Syndi L. Guido, Deputy General Counsel's Office, Arthur R. Thomas, Robert N. Campolongo, PA Board Probation & Parole, Harrisburg, PA, for Defendants.

## *MEMORANDUM*

BUCKWALTER, District Judge.

### I.  STATEMENT OF THE CASE

On September 29, 1964, the body of twelve-year old Edith Connor was found in

a narrow alley behind petitioner's shoe repair shop on 40 th Street in Philadelphia. The properties along 40 th Street had rear wooden fences with a door leading from the back yard into the three-foot wide alley. In the opinion of the Pennsylvania Supreme Court (*Commonwealth v. Thomas*, 448 Pa. 42, 292 A.2d 352 (1972)), the following narrative appeared:

> The police arrived, pronounced the girl dead at the scene and removed the body to the morgue. The body was then examined by one Dr. Edward Campbell, Medical Examiner and Forensic pathologist. The deceased's blouse had been torn and the zipper of her dungarees (men's style) was partially ripped off. The dungarees were also torn at the inner seams of the thighs on both sides of the crotch. The crotch seam of the deceased's panties was likewise torn. The cause of death was attributed to strangulation by ligature. There were also bruises to the skin of the neck, a broken bone on the right side of the neck and bruises of the voice box. Tears were found in the child's rectum and testing ascertained the presence of acid phosphates in the vagina.
>
> The clothing of the deceased was delivered to the Police Department Laboratory where brushings and microscopic examination disclosed particles of leather, leather dust, glue, polish, dog hairs, fiber and chips of paint adhering to the clothing. These findings led to the issuance of three search warrants for the person of and

premises occupied by the appellant, which premises were located at 1109 North 40 th Street and consisted of a shoe repair shop in the ground floor and living quarters in the rear of the shop. The execution of these warrants resulted in obtaining, *inter alia*, paint scrapings from various parts of the premises, specimens of leather, glue, fibers, threads and hairs, clothing of appellant, bed sheets, bedspreads and drapes. These specimens were delivered to the Police Department Laboratory, analyzed by Dr. Edward J. Burke, then the Laboratory Director, and compared with items removed from the deceased's clothing. The Commonwealth's entire case rested upon the testimony of Dr. Burke with reference to the similarity of the specimens.

Petitioner was convicted by a jury of first-degree murder of Edith Connor. He was sentenced to life imprisonment by Judge Joseph L. McGlynn, Jr. on April 23, 1971. The sentence was affirmed by the Supreme Court of Pennsylvania, *supra.*

His subsequent *pro se* petition for post conviction relief on a single technical ground that the indictment did not use the words "kill and murder" was denied. *Commonwealth v. Thomas*, 268 Pa.Super. 566, 408 A.2d 1148 (1979).

In 1973, a federal petition for habeas corpus was dismissed without prejudice for failure to exhaust state remedies (E.D.Pa. C.A. No. 73–2711).

In 1993, petitioner filed an application with the Pennsylvania Board of Pardons.[1]

---

1. Article 4, § 9 of the Pennsylvania Constitution provides:

   (a) In all criminal cases except impeachment, the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, after full hearing in open session, upon due public notice. The recommendation, with the reasons therefor at length, shall be delivered to the Governor and a copy thereof shall be

The four members of the Board of Pardons, Attorney General Ernest Preate, Jr., Dr. Daniel J. Menniti, Warden Thomas Frame, and Ronald J. Harper, Esq., who heard the case (then Lieutenant Governor Mark Singel did not hear the oral presentation), recommended unanimously that the life sentence of petitioner, which was computed from October 15, 1964, the day after petitioner's arrest, be commuted from life imprisonment to a term of imprisonment of thirty-one (31) years, nine (9) months, six (6) days to life expiring on July 21, 1996, and if he be released on parole in accordance with law he shall remain on parole the balance of his life unless returned to prison for violation of his parole.

The Board of Pardons added the following:

Mr. Thomas has served over twenty-nine years of his sentence. He has had only five misconducts since 1971. He has continued to maintain his innocence throughout his incarceration. He earned a Bachelor of Arts Degree from Villanova in 1992. He completed sex therapy and continues involvement with Alcoholics Anonymous. Since 1987, he has worked in the Weave Shop and has displayed excellent work habits. The Staff, Superintendent and Commissioner all support commutation due to the applicant's maturity and stability.

The members of the Board of Pardons were impressed by the strong community support for this application. Over two dozen individuals attended the clemency hearing on behalf of Mr. Thomas.

We are confident that he will have the necessary support to guide him from the structured environment of prison to productive living in society. We suggest a two year post-dated minimum sentence date of July 21, 1996. This will enable him the opportunity to take full advantage of pre-release programs offered by the Department of Corrections. At the expiration of his minimum sentence, he will have served nearly 32 years incarcerated.

On January 14, 1995, Governor Robert Casey granted commutation as follows:

Therefore, Know Ye, That in consideration of the promises and by virtue of the authority vested in me by the Constitution, I have commuted the sentence of life imprisonment of the said Louis C. Mickens–Thomas from life imprisonment to the minimum term of 31 years, 9 months, 6 days to life expiring on July 21, 1996, so that if he be released on parole in accordance with law he shall remain on parole the balance of his natural life unless returned to the correctional institution for violation of parole and that the sentence of imprisonment is hereby commuted accordingly so that he may be eligible for pre-release consideration at the discretion of the Dept. of Corrections. Subsequent to the date of my signature below a conviction of a new summary, misdemeanor or felony offense may upon a hearing by the Board of Pardons render my granting of this clemency null and void.

---

kept on file in the office of the Lieutenant Governor in a docket kept for that purpose.

(b) The Board of Pardons shall consist of the Lieutenant Governor who shall be chairman, the Attorney General and three members appointed by the Governor with the consent of two-thirds or a majority of the members elected to the Senate as is specified by law for terms of six years. The three members appointed by the Governor shall be residents of Pennsylvania and shall be recognized leaders in their fields; one shall be a member of the bar; one a penologist, and the third a doctor of medicine, psychiatrist or psychologist. The board shall keep records of its actions, which shall at all times be open for public inspection.

Amended May 16, 1967; May 20, 1975.

As set forth above, petitioner did not become eligible for parole until July 21, 1996. In July of 1995, after his commutation but before the expiration of his prison term, an act duly passed by the legislators and applicable to the Pennsylvania Board of Probation and Parole (hereafter the Board) provided in part as follows:

In no case shall the board act upon an application of an inmate whose term of imprisonment was commuted from life to life on parole or upon an inmate who was serving a term of imprisonment for a crime of violence or is an inmate serving a sentence under 42 Pa.C.S. § 9712 (relating to sentences for offenses committed with firearms) unless the inmate has served at least one year in a pre-release center.

61 P.S. § 331.34a.

The Department of Corrections did not approve petitioner for pre-release (Letter of June 6, 1995—P–21). On July 22, 1996, petitioner filed an application for release but the Parole Board notified him that it could not act upon his application since he had not completed one year in pre-release, citing 61 P.S. § 331.34a (See Respondent Exhibit 9 at 217, Letter to Leonard Sosnov, Esquire dated September 25, 1996).

On November 26, 1996, petitioner filed a petition for review in the nature of an action in mandamus invoking the original jurisdiction of the Commonwealth Court of Pennsylvania. See Mickens–Thomas v. Com., 699 A.2d 792 (1997). In that case, the Pennsylvania Board of Probation and Parole conceded that 61 P.S. § 331.34a could not be applied retroactively to petitioner. While petitioner was seeking an order compelling the Board to parole him, the Commonwealth Court denied that relief. Instead, it directed the Board by order dated 8/12/97 to "consider and rule on Petitioner's application for parole within ten days of the entry of this order and,

in the event of denial of the application, transmit a written statement of the reasons for the denial to the Pennsylvania Board of Pardons for its consideration of whether to accept the denial or immediately release petitioner on parole." Petitioner's November 12, 1997 notice of appeal from this judgment was quashed by the Pennsylvania Supreme Court on 1/15/98.

Pursuant to the directive of the Commonwealth Court, the Board considered petitioner's application for parole on August 21, 1997 and denied it. The Board asked for an evaluation by mental health staff experienced in dealing with sex offenders and scheduled another review for March of 1998. Also pursuant to the Commonwealth Court's order, the Board transmitted a written statement of its reason as follows: "Assaultive instant offense. Very high assaultive behavior potential. Victim injury. Unfavorable recommendation from the District Attorney. Conviction of prior assault offense." With regard to the latter, stipulation number 2, see infra, reads: "In 1945, Mr. Thomas was charged with rape when he was 17 years old. The rape charge was dismissed and a wayward minor charge was substituted. A wayward minor charge is not an adult conviction but a juvenile adjudication, for which Mr. Thomas was placed on probation."

On September 18, 1997, the Pardon Board by a vote of 3–2 concurred in the Board's action denying parole. The Pardon Board at this time was composed of Lieutenant Governor Mark Schweiker, Attorney General Michael Fisher, Warden Richard Gigliotti, Dr. Daniel Menniti and Thomas Harper, Esquire (See Stipulations, No. 4).

On October 29, 1997, petitioner filed an application for leave to file original process with the Pennsylvania Supreme Court, along with a petition for writ of habeas corpus seeking his immediate release from

prison. In a *per curiam* order entered January 28, 1998, the court allowed petitioner to file original process and summarily denied the habeas petition. *See Mickens–Thomas v. Vaughn*, No. 158 E.D. Misc. Docket 1997.

On March 30, 1998, the Board again denied petitioner's request for parole. The reasons given were: "Assaultive instant offense. Very high assaultive behavior potential. Victim injury. Your need for counseling and treatment." (Respondent's Exhibit 9 at 28). This action was taken even though petitioner was in full compliance with the Board's stipulations from the August 1997 hearing and had "full staff support" of the Department of Corrections.

A Review Summarization Report showed that petitioner had complied with the Board's stipulation under the August 21, 1997 order. Petitioner remained free of misconducts, was recommended for release by the Department of Corrections and was in full compliance with the treatment programs. (*See* P–5 (c)(e)).

Once again the Board scheduled another review for during or after March 2000. It forwarded the reasons for its decision to the Pardons Board which on April 21, 1998 concurred with the decision of the Board. (Respondent's Exhibit 10 at 232).

Petitioner filed the petition now before the court on December 6, 1999. While this litigation was pending, the Board, on March 9, 2000, once again denied parole and scheduled review for March of 2002. The following written stipulation has been entered into by the parties:

*Stipulations*

Both parties reserve the right to argue that the following information is irrelevant and should not be considered by the Court. Should the Court ultimately decide that the information is relevant and admissible, the parties stipulate that the following facts are true:

1. Mr. Thomas has not had any misconducts since 1990 but has incurred all of the misconducts listed on Exhibit R–1.

2. In 1945, Mr. Thomas was charged with rape when he was 17 years old. The rape charge was dismissed and a wayward minor charge substituted. A wayward minor charge is not an adult conviction but is a juvenile adjudication, for which Mr. Thomas was placed on probation.

3. Records have been located for 287 inmates whose life sentences were commuted between 1942 and the present. More than 287 life sentences were commuted during that time period, but their records could not be located by either the Board of Pardons or the Board of Probation and Parole. In each case of these 287 cases, the Governor commuted the inmate's minimum sentence from life in prison to a specified term of years, establishing a specific date on which that inmate would be eligible for parole. The records also indicate when 266 of those 287 cases were granted parole—259 were granted parole on their first application; seven were denied parole on their first application but subsequently granted parole. For those seven inmates, the parties stipulate to the information attached as Exhibits R2 through R8. Of the 266 inmates whose release dates are known, 228 were paroled between 1971 and 1995.

4. From January 1, 1997 until today, 63 life prisoners filed a total of 73 commutation applications with the Board of Pardons. The Board voted not to hold a public hearing on 69 of those applications; the Board granted a hearing on the remaining four applications. Three of those public hearings have already

been held, and the Board ultimately voted not to recommend commutation. The fourth public hearing has yet to be scheduled.

When the Board of Pardons concurred in the Parole Board's decisions not to release Mr. Thomas in September 1997 and March 1998, the Board of Pardons was comprised of Lt. Governor Mark Schweiker, Attorney General Michael Fisher, Dr. Daniel Menniti, Warden Richard Gigliotti, and Thomas Harper, Esquire. On both occasions, Schweiker, Fisher and Gigliotti voted to concur with the Parole Board's decision, whereas Mr. Harper and Dr. Menniti voted against concurrence.

During their tenure on the Board of Pardons, Lt. Governor Schweiker and Warden Gigliotti never voted in favor of recommending commutation of a life sentence. As of today, Attorney General Fisher has not yet voted in favor of recommending commutation of a life sentence; however, he voted in favor of holding a public hearing on three commutation cases, one of which has not yet been heard by the Board. Likewise, during his tenure, Warden Gigliotti did not vote in favor of recommending commutation of a life sentence. However, Warden Gigliotti did vote in favor of a public hearing in one commutation case.

5. The parties waive all objections, except for relevance to the admission of the documents listed on the attached list prepared by the plaintiff. (Exhibits 1–25).

6. Each time the Board of Probation and Parole refused to parole Mr. Thomas, the decision makers all had access to the Parole Board's entire file, docketed as 5308–H. Any document that was reviewed or considered by the Board is contained in that file. The parties waive all objections, except for relevance, to the admission of a complete copy of that file as redacted during discovery to replace identifying information with a generic description of the provider of the information (e.g.counselor, victim, etc.) (Exhibit R9).

7. Each time the Board of Pardons concurred in the Board of Probation and Parole's refusal to grant parole, every member of the Board of Pardons had access to the Board's entire file, docketed as B–427 Session July 1994. Any document that was reviewed or considered by the Board is contained in that file. The parties waive all objections, except for relevance, to the admission of that file as provided in discovery. (Exhibit R10).

8. The parties waive all objections, except for relevance, to the admission of an affidavit, dated December 12, 2001, by Nelson R. Zullinger, and its attachments. (Exhibit R11, Exhibit 11A and Exhibit 11B).

9. The parties waive all objections, except for relevance, to the admission of respondents' chart entitled "Life Prisoners Released by Commutation Compared with the Total Population of Life Prisoners (1971 through 2001)." (Exhibit R12).

10. The parties waive all objections, except for relevance to admission of documentation explaining the sexual offender treatment provided by the Joseph J. Peters Institute at the State Correctional Institute at Graterford. (Exhibit R13).

## II. STANDARD OF REVIEW

Initially, the court agrees with the petitioner's argument with regard to exhaustion of remedies as stated in its opinion of September 29, 2000. Accordingly its review of the constitutional claims is *de novo.*

Petitioner argues that the retroactive application of changes in rules, guidelines, policies or statutes governing a discretionary parole scheme may violate the *ex post facto* clause. As parole in Pennsylvania is governed by statutes, regulations and internal memoranda and guidelines, it follows that *ex post facto* principles are fully applicable. *Citing Coady v. Vaughn,* 251 F.3d 480 (3d Cir.2001), petitioner argues that as stated therein:

[T]wo critical elements must be present before a court may find that criminal or penal law violates the *ex post facto* clause: (1) the law must be retrospective, applying to events occurring before its enactment; and (2) it must disadvantage the offender affected by it. *Id.*

Thus, petitioner argues, since the Board has retrospectively applied statutory, rule and policy changes to him, the dispositive question is whether he has been disadvantaged by the application of changes in law.

Although the above summary is somewhat oversimplified, petitioner's statement of the law is substantially correct. As an initial matter, then, the court must determine what, if any, statutory law, rule and/or policy changes have retrospectively been applied to petitioner.

The Pennsylvania Probation and Parole Act of 1941 established the following policy:

The value of parole as a disciplinary and corrective influence and process is hereby recognized, and it is declared to be the public policy of this Commonwealth that persons subject or sentenced to imprisonment for crime shall, on release therefrom, be subjected to a period of parole during which their rehabilitation, adjustment and restoration to social and economic life and activities shall be aided and facilitated by guidance and supervision under a competent and efficient parole administration and to the

end it is the intent of this act to create a uniform and exclusive system for the administration of parole in this Commonwealth.1941, Aug. 6, P.L. 861, Section 1.

Petitioner then cites several Pennsylvania appellate court cases standing for or at least supporting the petitioner's contention that release on parole and rehabilitation under the Pennsylvania Probation and Parole Act was viewed as consistent with the statutory goal of protection of society. Indeed, the petitioner points to the following conclusion appearing in the 1991 50th Annual Report of the Board:

The Board and its staff recognize that ex-offenders can change if given the proper opportunities with dignity and respect. Conditional release on parole provides the offender with the opportunity for change which simultaneously enables the Board to meet its primary goal of the protection of society. It is through these efforts, and the willingness of the client to use these opportunities in a constructive way, that the real mission of the agency is accomplished. P–12.

The sentencing system in Pennsylvania permits the trial judge to determine when a defendant may be released from prison by the imposition of a minimum and maximum sentence. A defendant may apply for parole at the expiration of his minimum sentence. Petitioner references a 1989 Manual of Operating Procedure in which the Board states at 2.2 thereof: "The Board's intentions are not to circumvent the authority of the sentencing court and feel that an individual should be given every consideration for parole at the expiration of the minimum sentence."

In the 1991 50th Annual Report previously referred to, it was reported that about 80% of inmates are granted parole

at the initial review. (Petitioner Exhibit 12 at 6). By the first quarter of 1996, the release date on prisoner's minimum date dropped from 80% to 29%. *See Commonwealth v. Stark,* 698 A.2d 1327, 1332 (Pa.Super.1997).

Significantly, an amendment to the Probation and Parole Act in December of 1996 amended the public policy as to parole which now reads as follows:

> The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison.
>
> *In providing these benefits to the criminal justice system, the board shall first and foremost seek to protect the safety of the public.* In addition to this goal, the board shall address input by crime victims and assist in the fair administration of justice by ensuring the custody, control and treatment of paroled offenders.

Reflecting this amendment, the Board in its 1995–1997 report stated in its Mission Statement:

> *The Pennsylvania Board of Probation and Parole is committed to protecting the safety of the public,* addressing the needs of crime victims; improving county adult probation and parole services, and assisting in the fair administration of justice by ensuring the custody, control and treatment of offenders under the jurisdiction of the Board.

It seems clear that the Board has adopted the policy change made in the 1996 amendment. In this regard, a recent case from the Commonwealth Court of Pennsylvania contained the following:

> To further support its argument, the Board offered that even though Voss has not been paroled, the current public policy requires the Board to seek first and foremost to protect the safety of the public. While acknowledging that the public policy as to parole changed in 1996 from a client-centered policy emphasizing rehabilitation to one that emphasizes public safety, deterrence of crime and the incapacitation of criminals, the Board argues that the Section 19 standards by which an offender is reviewed have not changed and that it employed those standards in denying Voss' parole application.

*Voss v. Pennsylvania Board of Probation and Parole,* 788 A.2d 1107, 2001 WL 1584398 (Pa.Cmwlth.2001).

The statistical data from the state's records presented by petitioner tends to show that violent offenders now may face a significant likelihood of serving more time in prison and thus have been disadvantaged by the change in the law in 1996.[2]

---

**2.** The court has reviewed the exhibits which support the following statement in petitioner's brief:

> Under the amended statute, the Parole Board has treated violent offenders far more restrictively and has routinely held these inmates past their minimum parole eligibility dates. In 1997, 59% of the applications for parole of non-violent offenders were granted, but only 31% of violent offenders received parole. *See* P–8 at 0002538. During the week of March 19, 1998 (when petitioner was considered for parole) only 24% of violent offender parole applications were granted, while 62% of non-violent offenders received parole. *See* P–7 at 0002466. (For the entire year, 1998, 56% of non-violent offender parole applications were granted, while only 31% of violent offenders were paroled. P–9 at 0001647). Prior to these changes in law and policy with respect to violent offenders, upwards 80% of all offenders were granted parole. *See supra,* at 11. *See also Commonwealth v. Stark,* 698 A.2d 1327, 1332 (Pa.Super.1997) ("the release date on pris-

In the *Voss* case cited above, the Board argued that the Section 19 standards by which an offender is reviewed have not changed from the 1941 Act (which is substantially correct although some changes not pertinent to this argument were made). *See* 61 P.S. 331.21(a).

However, under the jurisprudence of this circuit (*see Coady, supra*) and the Supreme Court (*Garner v. Jones,* 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000)), if petitioner demonstrates by evidence drawn from the state's record that a rule's practical application, retrospectively, by the agency charged with exercising discretion will result in a longer period of incarceration than under the earlier rule, the *ex post* clause is violated.

The state correctly points out that petitioner's claim has to be more than mere speculation. That is to say, there must be clear knowledge that the retroactive application of the rule increases, to a significant degree, the likelihood or probability of prolonging petitioner's incarceration.

The statistical evidence of offenders charged with crimes of violence who are now less likely to get paroled may not be sufficiently complete as the state argues to prove that the retroactive application of any new law, rule or guideline of the Board has increased to a significant degree the likelihood of prolonging a prisoner's incarceration.

But those statistics cited by petitioner coupled with the stipulations 3 and 4 in this case and the history of petitioner's unsuccessful application in March of 1998, despite having seemingly complied with all prerequisites for parole, demonstrate that the agencies responsible for exercising discretion have retroactively applied the 1996

oner's minimum date dropped from 80% in the years from 1992–1993 to 29% in the first quarter of 1996"). Where a minimum sentence is viewed as too lenient, it is now

policy provision to petitioner, and this has increased to a significant degree the likelihood that petitioner will be in jail longer than if the pre–1996 policy would have been followed. It does not follow that petitioner should now be released. I agree with the state that what petitioner is entitled to have is that the Parole Board consider his application under the pre–1996 law.

Petitioner has also raised the argument that he was denied due process rights.

■ First, petitioner states that since he had a reasonable and objective expectation of release on parole, he had a liberty interest in parole which was violated by the parole refusal of March 19, 1998. However, this is not the case in Pennsylvania where parole is merely a possibility, an act which lies solely in the discretion of the Board. Like the case which petitioner cites in support of his argument, *Greenholtz v. Nebraska Penal Inmates,* 422 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the language and structure of Pennsylvania's Probation and Parole Act provides a mechanism for parole that is entitled to some constitutional protection. Petitioner has not pointed out how that mechanism is constitutionally defective other than his parole was refused. That clearly is not sufficient.

■ Petitioner makes a more thorough and detailed argument that he was denied substantive due process in that the refusal to parole him was arbitrary, capricious and fundamentally unfair. The thrust of petitioner's argument can be summarized from his brief at page 26:

considered a negative factor for parole. *See* P–24(a), "Truth–In–Sentencing Eligibility," at 9 (unnumbered).

Pennsylvania law required the Parole Board to grant parole unless it had concluded that petitioner was not rehabilitated and suitable for release into society. As we have demonstrated, the Pennsylvania statutory scheme did not permit a denial of parole based solely on the nature of the crime or the defendant's pre-offense behavior. Thus, as in *Greenholtz*, 442 U.S. at 10, 99 S.Ct. 2100, the Pennsylvania statutory scheme involves a "discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he had done." The Parole Board has "the fact-finding duty of determining in each case when the conditions prescribed by the legislature for provisional release from confinement have been complied with ..." *Commonwealth ex rel. Banks v. Cain*, 345 Pa. 581, 28 A.2d 897, 901 (1942).

In this case, the statutory mandate was completely ignored by the Parole Board. The Board's publicly stated reasons may appear rational, but, as we have demonstrated, the reasons were boilerplate, based solely on the offense committed over 33 years earlier.

The petitioner's contention is flawed, however.

Stipulation 6 provides that each time the Board refused parole to petitioner, the decision maker had access to the Board's entire file and that any document reviewed or considered by the Board is contained in that file marked as Exhibit R9.

I have reviewed that entire file and it does not support petitioner's argument that his denial of March 1998 (which is what he is contending) was based solely on the offense committed over 33 years earlier. Other factors as pointed out by respondent in its brief could have been considered by the Board to support its stated

reason of "very high assaultive behavior potential." For example, the report found at P–5(f) states:

PSYCHOLOGICAL REPORT: A 3–8–96 psychology evaluation describes an antisocial personality of superior intellect with a history of alcoholism. Testing indicates evidence of possible sexual preoccupation and psychosexual immaturity. Stability score is 2.

This court cannot substitute its judgment for the Board's even where as here the Board's decision is arguably contrary to the weight of the evidence in favor of parole. It's decision is not without any rational support in the record and thus petitioner's claim of denial of substantive due process falls short.

Having found an *ex post facto* violation, petitioner is entitled to relief. Both sides agree that a remand for a further hearing before the Parole Board under appropriate standards is the normal relief. Petitioner argues that where the Board intentionally evaded a court mandate or acted in bad faith, the court may order immediate release. Here, the Board has neither intentionally evaded a court mandate nor acted in bad faith.

An order follows.

### ORDER

AND NOW, this 15th day of March, 2002, the petitioner's writ of habeas corpus is GRANTED to the extent that the case is REMANDED for a further hearing before the Pennsylvania Board of Probation and Parole to be held within thirty (30) days under the standards that existed prior to the enactment of the amendment to the Probation and Parole Act codified at 61 P.S. 331.1.